City Trading Fund, Lawrence Bass and Andres Carullo as all of the Partners of City Trading Fund, a general partnership, suing on behalf of themselves and all others similarly situated, Plaintiffs,

against
C. Howard Nye, Stephen P. Zelnak, Jr., Sue W. Cole, David G. Maffucci, William E. McDonald, Frank H. Menaker, Jr., Laree E. Perez, Michael J. Quillen, Dennis L. Rediker, Richard A. Vinroot, Martin Marietta Materials, Inc., and Texas Industries, Inc., Defendants.


651668/2014

Mintz & Gold LLP and The Brualdi Firm, P.C., for plaintiffs.
Cravath, Swaine & Moore LLP, for defendant Martin Marietta Materials, Inc. and the individuals defendants.
Wachtell, Lipton, Rosen & Katz, for defendant Texas Industries, Inc.


Shirley Werner Kornreich, J.

I. Introduction
This case concerns the acquisition of Texas Industries, Inc. (TXI) by Martin Marietta Materials, Inc. (the Company), a North Carolina Corporation. The plaintiffs, stockholders of the Company,[FN1]
filed this action on May 30, 2014, alleging that the Company breached its fiduciary duties to its shareholders by making material misstatements and omissions in the definitive proxy, which was provided to the shareholders for the purpose of evaluating and voting on the proposed merger. Plaintiffs' operative pleading is their amended complaint that was filed on June 19, 2014. 
Simply put, this is a case where a stockholder sought to enjoin a merger on the ground of inadequate disclosures. The stockholder moved for a preliminary injunction, and on the eve of the hearing, the parties settled for a "peppercorn and a fee."[FN2]
In other words, they entered into a [*2]"disclosure-only" settlement that provides no monetary relief to the stockholders, but which calls for a significant payment of attorneys' fees to plaintiffs' counsel (here, $500,000). The "supplemental disclosures" are the gravamen of the settlement. They purportedly remedy the alleged deficiencies in the proxy. These new disclosures are supposed to help the shareholders make a more informed decision on the merger by providing them with additional useful information about the deal. They do not. Until recently, most courts would routinely approve such settlements. As discussed herein, that is no longer the case.
By order dated January 7, 2015, this court denied plaintiffs' motion for preliminary approval of the parties' settlement. See Dkt. 108 (City Trading Fund v Nye, 46 Misc 3d 1206(A) (Sup Ct, NY County 2015) (the 2015 Decision)).[FN3]
The 2015 Decision sets forth the procedural history of this action, the allegations in plaintiffs' amended complaint, the terms of the parties' settlement agreement, and the reasons why the court believed the immateriality of such terms warranted its refusal to approve the settlement. The court also addressed the public policy concerns that arise from worthless disclosure-only settlements of strike suits that seek to enjoin mergers of publicly traded corporations. Since the 2015 Decision was issued, the Delaware courts also have addressed worthless disclosure-only settlements, most notably in In re Trulia, Inc. Stockholder Lit., 129 A3d 884 (Del Ch 2016) (Bouchard, C.). In Gordon v Verizon Commc'ns, Inc., 148 AD3d 146 (1st Dept 2017), however, the First Department adopted a more lenient settlement approval standard utilizing the classic factors set forth in In re Colt Indus. S'holder Lit., 155 AD2d 154 (1st Dept 1990), aff'd as mod. 77 NY2d 185 (1991), plus two additional factors.[FN4]

Prior to issuing Gordon, on November 29, 2016, the First Department reversed this court's denial of preliminary approval, remanded the case, and directed this court to hold a fairness hearing to determine whether final approval of the settlement should be granted. See City Trading Fund v Nye, 144 AD3d 595 (1st Dept 2016) (City Trading II). City Trading II is a terse opinion in which the First Department held that this court's rulings were premature on a motion for preliminary approval. The First Department explained:
As a result of the proposed settlement, the shareholders obtained a number of additional disclosures reflected in the supplemental proxy statement, including disclosures of additional information regarding the investment banks' conflicts of interest and the projections upon which they relied in rendering their fairness opinions, that were arguably beneficial. The motion court's finding otherwise was, at the very least, premature, and should have awaited a fairness hearing during which opposition from shareholders could have been expressed.
The court reached its conclusion only in conjunction with its premature primary finding that the supplemental disclosures were so inadequate as to render the settlement not fair and adequate; on the record before us, the evidence of the tactics of the named plaintiffs and their counsel is not sufficient to warrant denial of preliminary class certification and preliminary approval of the settlement.
City Trading II, 144 AD3d at 595-96 (emphasis added; internal citations omitted).[FN5]
Nothing in City Trading II purports to find fault with the substantive findings of this court. The First Department's only remark on the merits of the supplemental disclosures is that they are "arguably" beneficial. As discussed herein, that characterization falls below the standard subsequently set forth in Gordon (and, of course, is well below Trulia's "plainly material" standard).

On September 12, 2017, plaintiffs filed the instant motion for final approval of their settlement agreement, which is set forth in a Memorandum of Understanding dated June 20, 2014. See Dkt. 148 (the MOU).[FN6]
Defendants do not oppose the motion (because they cannot without violating the MOU). However, as anticipated by the First Department, there are several objectors.
On September 18, 2017, Gardner Russo & Gardner LLC (GRG), which has been an institutional shareholder of the Company for over 20 years and owned shares in the Company valued between approximately $260,000 and $415,000 (i.e., far more than the value of CTF's ten shares), objected to the settlement because it "did not believe that the additional disclosures [CTF] demanded were necessary nor would they have been helpful to our shareholders." See Dkt. 171 at 2. GRG complained that "[i]t was unfair for such an exceedingly small shareholder as [CTF], with so little economic stake in the transaction, to have been able to delay [a merger] vote based on a request for insignificant incremental disclosures, when other, much larger shareholders such as [GRG]" did not want the vote delayed. See id. at 3. In other words, GRG felt that the disclosures in the preliminary and definitive proxies were sufficient to allow it to make an informed decision on the proposed merger. Another shareholder, Chapter IV LLC, by way of a June 27, 2017 letter from its CEO, expressed similar sentiments. See Dkt. 136 ("I strongly disagreed, and continue to disagree, with Plaintiff's disclosure claims against [the Company]. I found the additional disclosures to be completely unnecessary and not helpful to me as a shareholder.") (emphasis added). Then, on September 19, 2017, the North Carolina Chamber, a "nonprofit, nonpartisan business advocacy organization dedicated to improving the lives of all North Carolinians," filed an amicus brief in which it "urges" the court to reject the settlement. See Dkt. 164. Its brief largely addresses the same public policy concerns with disclosure-only settlements articulated in the 2015 Decision and in Trulia.
Plaintiffs filed a reply brief on October 10, 2017. Notably, they do not contend that any other shareholder supports the settlement, nor do they submit evidence that any other shareholder found the supplemental disclosures to have been helpful in deciding whether to vote for the merger. After a hearing on final approval was conducted on October 17, 2017, the court reserved on the motion. See Dkt. 187 (10/17/17 Tr.).
II. Governing Law
Since the Company is a North Carolina corporation, the internal affairs doctrine dictates that plaintiffs' claims for breach of fiduciary duty (i.e., their inadequate disclosure claims) are governed by North Carolina law. Hart v Gen. Motors Corp., 129 AD2d 179, 182 (1st Dept 1987); see Davis v Scottish Re Group Ltd., 30 NY3d 247, 253 (2017) ("the internal affairs doctrine, which provides that relationships between a company and its directors and shareholders are generally governed by the substantive law of the jurisdiction of incorporation."). This doctrine "is a conflict of laws principle which recognizes that only one State should have the [*3]authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." New Greenwich Lit. Trustee, LLC v Citco Fund Servs. (Europe) B.V., 145 AD3d 16, 22 (1st Dept 2016); see Wilson v Dantas, 29 NY3d 1051, 1064 (2017). As discussed in the 2015 Decision, North Carolina (like New York) generally follows and applies Delaware corporate law. See 2015 Decsion at 4, citing Gusinsky v Flanders Corp., 2013 WL 5435788, at *7 (NC Super Ct 2013) ("the North Carolina Court of Appeals adopted the Delaware courts articulation of a director's fiduciary duty to disclose and also the Delaware courts' standard for 'materiality.'"). Hence, the applicable materiality standard for determining whether plaintiffs' disclosure claims have merit and whether the supplemental disclosures are material are governed by Delaware law. 
As discussed in the 2015 Decision:
The standard for determining whether an omission is material is well settled:
An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote [The standard contemplates a] showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
In re Cogent, Inc. S'holder Lit., 7 A3d 487, 509 (Del Ch 2010), quoting TSC Indus., Inc. v Northway, Inc., 426 US 438, 449 (1976) (emphasis added). Hence,

Directors do not need to disclose [ ] all information about a particular subject, or even information that is simply helpful if it does not meet the above standard. Furthermore, because the standard requires full disclosure of all material facts, courts should assess the qualitative importance of each particular disclosure item at issue.
In re Cogent, 7 A3d at 509-10 (emphasis added) [footnote 6: Cf. Amgen Inc. v Conn. Ret. Plans & Trust Funds, 133 SCt 1184, 1197 (2013) ("No doubt a clever mind could conjure up fantastic scenarios in which an individual investor might rely on immaterial information (think of the superstitious investor who sells her securities based on a CEO's statement that a black cat crossed the CEO's path that morning). But such objectively unreasonable reliance does not give rise to a Rule 10b-5 claim.").] Simply put, "[w]hile directors must give stockholders an accurate, full, and fair characterization of the events leading up to a board's decision , Delaware law does not require a play-by-play description of every consideration or action taken by a Board, especially when such information would tend to confuse stockholders or inundate them with an overload of information." Id. at 511-12. 2015 Decision at 5-6 (emphasis in original); see In re Solera Holdings, Inc. Stockholder Lit., 2017 WL 57839, at *9 (Del Ch 2017) ("Under Delaware law, when directors solicit stockholder action, they must disclose fully and fairly all material information within the board's control. [I]nformation is not material simply because [it] might be helpful. Rather, it is material only if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. In other words, information is material if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it significantly alter[s] the 'total mix' of information made available.") (emphasis added; citations and quotation marks omitted).
The federal courts apply the same standard of materiality. See FHFA v Nomura Holding [*4]Am., Inc., 873 F3d 85, 146 (2d Cir 2017) ("a statement or omission is material if a reasonable investor would view [it] as significantly altering the total mix of information made available.") (emphasis added; citations omitted).[FN7]
Indeed, the New York Court of Appeals has expressly adopted the federal standard for determining the materiality of an omission. State v Rachmani Corp., 71 NY2d 718, 726 (1988). Significantly, relying on Rachmani, the First Department has held that "omitted information is material if there is a 'substantial likelihood' that a 'reasonable shareholder' would have considered it important; that is, if he or she would have viewed it 'as having significantly altered the 'total mix' of available facts." 2 Fifth Ave. Tenants Ass'n v Abrams, 183 AD2d 577, 578 (1st Dept 1992) (emphasis added); see Cohen v Calloway, 246 AD2d 473 (1st Dept 1998) ("The proxy statement in issue demonstrates that the Fischer-Scholes method of valuing the stock options that were proposed for defendant corporation's nonemployee directors would not have been viewed by the reasonable investor as a significant part of the total mix of information in the proxy statement.") (emphasis added); see also Academy St. Assocs. v Spitzer, 50 AD3d 271, 272 (1st Dept 2008) ("It was neither arbitrary nor capricious for respondent to conclude that these are material facts that may have significantly altered the "total mix" of information available to the investor.") (emphasis added). Likewise, where New York courts have applied a materiality standard that made no mention of the "total mix of information" test, those courts still made clear that materiality is defined to mean that, counterfactually, the plaintiff would have acted differently but for the alleged misrepresentation or omission. See Leading Ins. Group Ins. Co. v Xiao Wu Chen, 150 AD3d 977, 978 (2d Dept 2017) ("A misrepresentation is material if the insurer would not have issued the policy had it known the facts misrepresented."); see Ambac Assur. Corp. v Countrywide Home Loans, Inc., 151 AD3d 83, 87 (1st Dept 2017), citing 128 Hester LLC v NY Marine & Gen. Ins. Co., 126 AD3d 447 (1st Dept 2015) (same). It is clear, therefore, that New York's longstanding understanding of materiality tracks that of Delaware and the federal courts.
That said, the standard for approving a class action settlement is a matter of procedural (i.e., not substantive) law, and thus it is New York's standard that must be applied. CPLR 908; see Gordon, 148 AD3d at 166. Moreover, where, as here, the settlement agreement is governed by New York law [see Dkt. 148 at 13], the First Department has held that New York's settlement approval standard must be applied. See Gordon, 148 AD3d at 156. Thus, where a New York court is called upon to approve a settlement of a class action concerning claims governed by the internal affairs of a Delaware corporation (or, indeed, any foreign corporation), New York's settlement approval factors should be applied, while the merits of the underlying clams are governed by Delaware law. Hence, as discussed herein, the court must apply the New York "likelihood of success on the merits" factor by looking to Delaware law to ascertain those merits.III. Trulia's "Plainly Material" vs. Gordon's "Some Benefit"
In Gordon, the First Department noted "[t]he increasingly negative view of 'disclosure-only' settlements" and that "decisions of courts in both Delaware and New York call[ed] for drastic curtailment of such class action suits, finding them to amount to meritless lawsuits filed in order to raise a threat of enjoining or delaying closure of the transaction." Gordon, 148 AD3d at 154, citing, e.g., Trulia, 129 A3d at 887. Trulia, a thorough and compelling decision authored by [*5]Chancellor Bouchard,[FN8]
was the culmination of the Chancery Court's negative experience with such strike-suits, which not only impugn the integrity of the court system, but also adversely affect the ability of stockholders with genuine claims to hold corporate directors accountable for [*6]actual, serious breaches of fiduciary duty (e.g., by virtue of "intergalactic" releases).[FN9]
Without belaboring the point or relitigating its merits, suffice it to say that the Chancellor, in considering the Chancery Court's prior opinions and the work of some of the most respected legal academics,[FN10]
came to the conclusion that the solution was to require that: "the supplemental disclosures address a plainly material misrepresentation or omission, and the subject matter of the proposed release is narrowly circumscribed to encompass nothing more than disclosure claims and fiduciary duty claims concerning the sale process, if the record shows that such claims have been investigated sufficiently." See Trulia, 129 A3d at 888 (emphasis added). "In using the term 'plainly material,'" the Chancellor explained that he meant "that it should not be a close call that the supplemental information is material as that term is defined under Delaware law." Id. (emphasis added). In other words, approval requires a clear showing that the supplemental disclosures were more than "arguably beneficial" or that they may provide "some benefit." Rather, it must be clear that the new disclosures would clearly aid shareholders in deciding whether to vote on the merger by significantly altering the "total mix" of available information. See id. at 899. 


The Chancellor, anticipating the foreseeable forum shopping his rule would incentivize (a concern, as noted, subsequently echoed by Professor Coffee), wrote the following:
[S]ome have expressed concern that enhanced judicial scrutiny of disclosure settlements could lead plaintiffs to sue fiduciaries of Delaware corporations in other jurisdictions in the hope of finding a forum more hospitable to signing off on settlements of no genuine value. It is within the power of a Delaware corporation to enact a forum selection bylaw to address this concern. In any event, it is the Court's opinion, based on its extensive experience in adjudicating cases of this nature, that the historical predisposition that has been shown towards approving disclosure settlements must evolve for the reasons explained above. We hope and trust that our sister courts will reach the same conclusion if confronted with the issue.
Id. at 899 (emphasis added). His hope was initially vindicated when both the Fifth and Seventh Circuits expressly adopted Trulia's "plainly material" standard. See Farber v Crestwood Midstream Partners L.P., 863 F3d 410, 415-16 (5th Cir 2017); In re Walgreen Co. Stockholder Lit., 832 F3d 718, 725 (7th Cir 2016).[FN11]

In Gordon, the First Department declined to do so. The Court held that to determine whether to grant final approval of a disclosure-only settlement of a class action, courts should apply the classic Colt factors — "the likelihood of success, the extent of support from the parties, the judgment of counsel, the presence of bargaining in good faith, and the nature of the issues of law and fact" — plus two new factors: "whether the proposed settlement is in the best interests of the putative settlement class as a whole" and "whether the proposed settlement is in the best interest of the corporation." See Gordon, 148 AD3d at 156, 158, 161. According to the First Department, the new, sixth factor (regarding the best interests of the class) is satisfied where the supplemental disclosures provide "some benefit to the shareholders." See id. at 159 (emphasis added). Hence, approval under Gordon requires a lesser showing than under Trulia. 
That said, while Gordon, unlike Trulia, does not requires the plaintiff to remove any doubt that the supplemental disclosures are material, this court does not read Gordon (which, as noted, post-dated City Trading II, and thus is the controlling authority)[FN12]
to permit approval if plaintiff merely makes a showing that the supplemental disclosures are "arguably beneficial" — the expression used in City Trading II. This court does not believe that the First Department in City Trading II purported to opine on whether the subject supplemental disclosures provide "some benefit" to the class. The First Department found it appropriate to defer such a determination to the final approval hearing, describing the disclosures as "arguably" beneficial, thereby invoking the lesser standard applicable on a motion for preliminary approval. See Saska v Metro. Museum of Art, 53 Misc 3d 1212(A), at *10-11 (Sup Ct, NY County 2016) (collecting authority on standard for preliminary approval), citing, e.g., In re Platinum & Palladium Commodities Lit., 2014 WL 3500655, at *11 (SDNY 2014) ("[p]reliminary approval 'is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."), quoting In re Traffic Exec. Ass'n-E. Railroads, 627 F2d 631, 634 (2d Cir 1980). This court, now, must evaluate the supplemental disclosures under the standard set forth in Gordon. 
Nonetheless, before doing so, it is necessary for the court to determine what the First Department meant in Gordon when it used the words "some benefit" to describe the requisite threshold of importance the supplemental disclosures must meet. As discussed herein, while not explicitly stated in Gordon, the "some benefit" test appears to have been derived from the standard applicable to a mootness fee application under Delaware law. See In re Xoom Corp. Stockholder Lit., 2016 WL 4146425, at *3 (Del Ch 2016) ("The theory under which a mootness [*7]fee is awarded is a subspecies of the common-benefit doctrine, which recognizes that, where a litigation provides a benefit to a class or group, costs necessary to the generation of that benefit should also be shared by the group or its successor.") (Glasscock, V.C.); cf. Trulia, 129 A3d at 898 ("The preferred scenario of a mootness dismissal appears to be catching on."). In Delaware, a mootness fee "can be awarded if the disclosure provides some benefit to stockholders, whether or not material to the vote," and even where the settlement does not warrant court approval. Xoom, 2016 WL 4146425, at *3 (emphasis added). Xoom was cited favorably and discussed extensively by the First Department in Gordon. See Gordon, 148 AD3d at 155, 155 n.5, 165. Not only was the "some benefit" test applied by the court in XOOM, but, instructively, a standard for what constitutes "some benefit" is articulated — "some benefit means that the disclosure was 'helpful to the shareholders.'" See id. (emphasis added), citing Sugarland Indus., Inc. v Thomas, 420 A2d 142, 147 (Del 1980); see also Louisiana Mun. Police Employees' Ret. Sys. v Black, 2016 WL 790898, at *6 (Del Ch 2016) ("The Court's discretion in awarding attorneys' fees in these circumstances is guided by the familiar Sugarland factors: benefits achieved by the plaintiff, complexities of the issues, the contingent nature of the fee, the time and effort of counsel, and the standing and ability of counsel."). "Helpful" is a lower bar than "material." See Gordon, 148 AD3d at 155 n.5 ("The Delaware Chancery Court reasoned that under these circumstances, the settlement need not provide a material benefit to the shareholders and that a 'helpful disclosure' to the shareholders may be sufficient to justify an award of attorneys' fees."). Information can be helpful even if it does not significantly alter the total mix of available information. 
That being said, regardless of whether Gordon's some benefit test was intended to mirror the Delaware mootness fee standard, the only reasonable way to interpret "some benefit" is that while the plaintiff need not (as under Trulia) rule out all doubts as to the materiality of the supplemental disclosures, the court must be able to plausibly conclude that the supplemental disclosures would, in fact, aid a reasonable shareholder in deciding whether to vote for the merger. If the supplemental disclosures would not do so, then there is no basis to conclude that such disclosures were of any benefit to the shareholders. After all, the whole point of a lawsuit challenging the sufficiency of pre-merger disclosures is to ensure that shareholders have all the information they need to make an informed vote on the merger's wisdom. For the relief in such a suit to be beneficial, the procured new disclosures must actually be useful to the shareholders — that is, the disclosures must aid them in the decision-making process.[FN13]
If the disclosures reveal information that has no bearing on the wisdom of the merger — such as a disclosure of the CEO's favorite baseball team — no one would contend such revelation makes a shred of difference to a voting shareholders. There is no benefit to such disclosure. 
On the other hand, if a management projection made in the ordinary course of business [*8](e.g., not solely for the purpose of soliciting bids) was not originally disclosed, and such projection reveals a valuation based upon a discounted cash flow (DCF) analysis that materially deviates from the agreed-upon sale price, such a revelation surely would bear on the shareholders' desire to approve the merger. Indeed, such a disclosure would not only be of "some benefit", but would likely qualify as plainly material. As Vice Chancellor Laster recently explained:
The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business. Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of the company's operations. When management projections are made in the ordinary course of business, they are generally deemed reliable. This court has rejected projections that were not prepared in the ordinary course of business and which showed the influence of the transactional dynamics in which they were created.

ACP Master, Ltd. v Sprint Corp., 2017 WL 3421142, at *31 (Del Ch 2017) (citations and quotation marks omitted; emphasis added); see In re PetSmart, Inc., 2017 WL 2303599, at *32 (Del Ch 2017) ("The first key to a reliable DCF analysis is the availability of reliable projections of future expected cash flows, preferably derived from contemporaneous management projections prepared in the ordinary course of business. As this court has determined time and again, if the data inputs used in the model are not reliable, then the results of the analysis likewise will lack reliability. And, as the experts in this case both agree, to be reliable, management's projections should reflect the expected cash flows of the company, not merely results that are hoped for."). (citations and some quotation marks omitted).[FN14]
 
The projections in the supplemental disclosures were not management projections prepared in the ordinary course of business. While projections relied upon by analysts and advisors can be considered material, that is only the case if those projections were generated by management in the ordinary course of business. By contrast, independent, third-party projections, such as those at issue here, regardless of whether they are publicly available (here, they were, but for a price), are not considered material. They are of trivial value given all of the other information disclosed to the shareholders. As noted by the Chancellor:
Plaintiffs' contention that the Board failed to disclose the base case or sensitivity case projections is without merit because the Proxy fully and fairly discloses that information. As to the Wall Street case, Plaintiffs have not shown a reasonable probability that a reasonable stockholder would think that the undisclosed (but publicly available) analyst projections—as opposed to the disclosed ranges of implied share prices derived from them—would significantly alter the total mix of information available in the Proxy. In my view, analyst projections generally are far less important than [*9]management projections. I am hard pressed to see how a reasonable stockholder would find the specific analyst projections Morgan Stanley used to be material in deciding whether to vote in favor of the Merger.
In re Family Dollar Stores, Inc. Stockholder Lit., 2014 WL 7246436, at *22 (Del Ch 2014) (emphasis added). Likewise, the sort of financial analysts' projections at issue here — which, again, are not management projections made in the ordinary course of business — are not material. 

Plaintiffs do not appear to dispute this line of authority. On the contrary, they seem to embrace it. But in their briefs, plaintiffs' discussion of this line of cases notably omits the critical distinction between management and analyst projections, and they wrongly imply that Delaware deems all projections to be material. See Dkt. 130 at 12-13. Yet, buried in a block quotation of one of the cases cited by plaintiffs, Vice Chancellor Laster makes it clear that the projections he found material were "management projections." See Dkt. 130 at 7 (emphasis added), quoting Continuum Capital v Nolan, No. 5687-VCL (Del Ch, 2/3/11 Tr. at 94-96). However, plaintiffs' briefs (and their statements at oral argument) suggest that the sort of analyst projections provided in the supplemental discourse are valued by the Delaware courts. That is demonstrably false. Plaintiffs should not have, with the lone exception of the block quote in Continuum Capital, consistently referred to the importance "financial projections," without the word "management" preceding that expression.[FN15]
That is a deceptive portrayal of the law. 
Counsel is admonished for their misleading citations to authority. They, likewise, misleadingly write that Trulia "acknowledged the importance of disclosure of projections." See Dkt. 130 at 12 n.8, citing Trulia, 129 A3d at 901 n.57. But if one actually reads footnote 57 in Trulia, the Chancellor states that the law does "not require disclosure of all the data underlying a fairness opinion" and that the sort of projections to which plaintiffs refer, critically, are management projections. 
This court is hard-pressed to believe that plaintiffs' able counsel, who is well versed in merger litigation, does not know the difference between the materiality of management and analyst projections. While counsel is not wrong to assume that Delaware courts know more about these issues than this court (i.e., why deference is perhaps owed to Trulia, as that court has such a wealth of expertise to inform its disclosure settlement rules), it is deceptive to leverage that perceived ignorance by not accurately portraying the law.[FN16]
Such conduct is particularly egregious in a situation where, as here and at the appellate level, there is no adversarial briefing. 
To be sure, there is no denying the difficulty of assessing the value of supplemental [*10]disclosures that are not necessarily as utterly worthless as a CEO's baseball rooting interest, yet not as paramount as management's view of the company's value. This court is thankfully relived of this burden given the extreme end of the usefulness spectrum on which the subject supplemental disclosures reside. This case is not a close call. As discussed below, and as the objecting shareholders credibly contend, all of the supplemental disclosures are utterly useless to the shareholders.
IV. The Supplemental Disclosures
In the 2015 Decision, this court extensively addressed the "ten categories of allegedly inadequate disclosures set forth in the [amended complaint]." See id. at 6-14.[FN17]
The parties' settlement purportedly remedies some of these issues by providing four supplemental disclosures. As the court explained:
The first is titled "Supplement to 'Background of the Merger'". This supplemental disclosure is meant "to be inserted after the first sentence in the twenty-fifth paragraph under the heading 'Background of the Merger' on page 42 of the Definitive Joint Proxy Statement/Prospectus." The complete disclosure is reproduced below, with the supplemental disclosure in bold: On January 3, [4 and 5, 2014], Mr. Nye reviewed and discussed the TXI proposal with the other members of [the Company's] management, as well as [the Company's] directors and financial and legal advisors. These discussions focused on the impact of TXI's revised forecast, and the additional diligence that was provided by TXI to [the Company] as a result of such revised forecast, on [the Company's] value assessment and TXI's proposed exchange ratio of 0.70, as well as TXI's position on the resolution of the other open issues under negotiation noted above. As a result of these discussions, [the Company's] management determined that [the Company] would continue to require additional time to consider and review TXI's proposal in light of the additional information that had been provided.
This supplemental disclosure purports to remedy the tenth alleged deficient disclosure [regarding discussions about the rationale for the merger]. [T]his level of detail is not material. Regardless, the supplemental disclosure provided is both vague and general in nature. Nothing in this supplemental disclosure explains to the shareholders why this information is material, nor have plaintiffs provided such an explanation to the court.

2015 Decision at 17 (citations omitted; bold in original; bolded italics added for emphasis).
It is well settled that this type of "tell me more" disclosure is not legally material. In re Saba Software, Inc. Stockholder Lit., 2017 WL 1201108, at *9 (Del Ch 2017) (collecting cases) ("This court typically is not receptive to these kinds of 'why' or 'tell me more' disclosure claims that criticize the board for failing to explain its motives when making transaction-related decisions."), citing, e.g., Se. Pa. Transp. Auth. v Volgenau, 2013 WL 4009193, at *20 (Del Ch 2013) ("the Plaintiff contends that SRA should have disclosed 'information regarding how the Board determined that the Merger conformed to the equal treatment requirements' in SRA's certificate. This 'tell me more' type of disclosure, however, is not likely to be important to a reasonable investor because the proxy discloses the material, pertinent facts."), aff'd, 91 A3d 562 (Del 2014) (emphasis added). Of course, common sense suggests that a shareholder being [*11]generally informed that management had conversations about forecasts is not useful information. Obviously, such conversations took place. See In re Merge Healthcare Inc., 2017 WL 395981, at *9 (Del Ch 2017) ("Redundant facts, insignificant details, or reasonable assumptions need not be disclosed.").
Nor is this terse disclosure useful. Shareholders are not wont to independently value the company. See In re Cyan, Inc. Stockholders Lit., 2017 WL 1956955, at *16 (Del Ch 2017) ("[s]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely. A fair summary, however, is a summary. By definition, it need not contain all information underlying the financial advisor's opinion or contained in its report to the board.") (citations and quotation marks omitted). Rather, shareholders want to know that there is good reason to believe the merger price is fair (based on, among other things, the knowledge that management considered reliable projections, that independent financial analysts concur with management's view of the deal, and the solicitation and negotiation process was robust and free of red flags). Here, the shareholders received such assurances. That is why, perhaps unsurprisingly, the shareholders overwhelmingly supported the merger and why institutional shareholders, such as GRG, were quite upset when plaintiffs sought to delay the merger pending their pursuit of immaterial additional disclosures. That shareholders such as plaintiffs actually hurt the company is one of the rationales of Trulia. See Trulia, 129 A3d 884 at 896 ("Given the rapid proliferation and current ubiquity of deal litigation, the mounting evidence that supplemental disclosures rarely yield genuine benefits for stockholders, the risk of stockholders losing potentially valuable claims that have not been investigated with rigor, and the challenges of assessing disclosure claims in a non-adversarial settlement process, the Court's historical predisposition toward approving disclosure settlements needs to be reexamined.").
The next supplemental disclosure:
is titled "Supplement to 'Summary of Material Joint Analyses—Estimates'". This disclosure is two sentences meant to be inserted at the end of the first two paragraphs "under the heading 'Summary of Material Joint Analyses—Estimates' on page 58 of the Definitive Joint Proxy Statement/Prospectus." The two paragraphs in the original disclosure generally discussed certain data used to produce financial forecasts for the Company. The supplemental disclosure provides:
The publicly available consensus estimates of TXI's CY2014E and CY2015E EBITDA from I/B/E/S used by the [Company's] Financial Advisors in their analyses were $165 million and $228 million, respectively The publicly available consensus estimates of [the Company's] CY2014E and CY2015E EBITDA from I/B/E/S used by the [Company's] Financial Advisors in their analyses were $476 million and $589 million, respectively.
These are the "publicly available Wall Street research analyst estimates" regarding EBITDA at issue in the sixth and seventh alleged deficient disclosures. Aside from the reasons discussed earlier, this information is immaterial because the law "does not mandate the disclosure of every conceivable valuation datum, method, or alternative." In re Novell, Inc. S'holder Lit., 2013 WL 322560, at *13 (Del Ch 2012), citing In re General Motors (Hughes) S'holder Lit., 2005 WL 1089021, at *16 (Del Ch 2005) ("A disclosure that does not include all financial data needed to make an independent determination of fair value is not ... per se misleading or omitting a material fact. The fact that the [*12]financial advisors may have considered certain nondisclosed information does not alter this analysis."), aff'd 897 A2d 162 (Del 2006). Rather, "[a]ll that is required is a "fair summary" of a financial advisor's work." In re Novell, 2013 WL 322560, at *13, citing In re CheckFree Corp. S'holder Lit., 2007 WL 3262188, at *2-3 (Del Ch 2007) (directors have no duty to provide a specific "checklist" of items when drafting proxy statements). Here, as set forth below, such information was provided.
2015 Decision at 18-19 (emphasis in original; some citations omitted). There really is not much more to say on this issue. This type of (publicly available) third-party, non-management projection is not legally material and is of little value.[FN18]
The court is unaware of any legal authority or respected academic source that contends this sort of projection is of any real use to shareholders. On the contrary, the Delaware cases cited herein and in the 2015 Decision refute this notion.[FN19]
Indeed, plaintiffs do not contend that they or any other shareholder actually relied on this information in deciding to vote for the merger, nor do they explain, conceptually, how these projections affected their view of the merger. The only reasonable inference the court can draw from these omissions is that this information does not matter.

Turning now to the third supplemental disclosure, it:
is titled "Supplement to 'Opinions of Martin Marietta's Financial Advisors'". These are disclosures of positions in TXI held by JPMorgan, Deutsche Bank, and Barclays, as reported in their quarterly SEC filings of December 31, 2013 and March 31, 2014. Unsurprisingly, all three banks owned common shares of TXI. Barclays also held put [*13]and call options. No reasonable shareholder should care about these positions in deciding whether to vote in favor of the Merger. Yet, the third, fourth, and fifth alleged disclosure deficiencies claimed these banks' exact positions mattered. They do not. No one is asserting a claim for illegal insider trading, nor is there any reason to think the banks' advice was rendered to profit from the merger, as opposed to generally curry favor from the corporate world for the purpose of procuring future engagements. Though the latter issue is an incentive concern raised by many, it is a broader issue that is not relevant to or remedied by the subject disclosures.
The Company also disclosed the exact amount of fees (approximately $1.8 million) that one of TXI's institutional shareholders paid to JPMorgan for basic corporate treasury and securities services. The Company originally disclosed that customary fees were paid. This was sufficient. See Globis Partners, L.P. v Plumtree Software, Inc., 2007 WL 4292024, at *13 (Del Ch 2007) (holding that where proxy disclosed that fees were "'customary' and partially contingent, but did not provide further details", "[w]ithout a well-pled allegation of exorbitant or otherwise improper fees, there is no basis to conclude [that disclosure of exact amount] of compensation, per se, would significantly alter the total mix of information available to stockholders"). In any event, these fees have nothing to do with the Merger. If this shareholder did not pay JPMorgan for these services, it would have had to pay another bank a comparable amount for them. Plaintiffs' insinuation that these services or fees are somehow relevant to the propriety of the Merger is frivolous.

2015 Decision at 19-20 (emphasis added; some citations omitted). 


Prior to the enactment of the Volker rule (12 USC § 1851), most (if not all) large banks that provided advice on large corporate mergers also had proprietary trading desks that had positions in the common stock of virtually every single publicly traded corporation. Even now, to facilitate normal market making activities, banks continue to do so. The notion that the advice of JPMorgan, Deutsche Bank, and Barclays regarding the merger would be materially affected by the number of TXI shares held by those banks (which surely changed every day, if not every minute — and, with the proliferation of high frequency trading, likely every second) is implausible. Banks are supposed to maintain walls between their research and trading divisions to keep research objective and deter insider trading. There is no reason to believe (and certainly none proffered by plaintiffs) that the incentives of those bankers who advocated for the merger were tainted by their colleagues on the proprietary trading desk. Yet, even if there was some basis to speculate that the bankers' incentives were corrupted, plaintiffs' theory of materiality still makes no sense. The stock price will typically go up upon the announcement of a merger, but only if the market believes in the merger's wisdom. If the banks had proprietary net long positions in TXI, and if such positions affected their advice on the merger, it strains credulity to believe those banks would recommend an unwise merger if there was reason to believe the market would disagree, since that would result in the stock price dropping.
Equally (if not more) absurd, as explained in the 2015 Decision, is the notion that the specifics of what a TXI shareholder (not TXI or the Company) paid to JPMorgan for basic corporate treasury and securities services is important (let alone material) to shareholders. Plaintiffs cite no authority for this proposition. Rather, in keeping with their reliance on inapposite caselaw, they cite authority that holds that compensation paid by the company (as [*14]opposed to one of its shareholders) to a bank is material. This court is unaware of any case that held that shareholders care about the relationships between stockholders in the merger target and the banks advising on the merger, especially when that relationship is limited to payment for basic banking services (which all companies require from some financial institution). It is implausible to believe such information would matter at all to any reasonable shareholder.[FN20]

Finally:
the fourth supplemental disclosure is titled "Supplement to 'Financial Interests of Martin Marietta Directors and Officers in the Merger'". This disclosure "supplements and replaces the first two sentences in the second paragraph under the heading 'Financial Interests of Martin Marietta Directors and Officers in the Merger' on page 72 of the Definitive Joint Proxy Statement/Prospectus." The original disclosure stated:
Martin Marietta's directors and executive officers will not receive any special compensation the payment of which is contingent upon completion of the merger. Certain of Martin Marietta's executive officers may receive compensation under Martin Marietta's executive compensation programs attributable to additional responsibilities in connection with the merger and subsequent integration process.
This is the first category of disclosure plaintiffs complained about. The replacement language in the supplemental disclosure states:
Martin Marietta's directors and executive officers will not receive any special [*15]compensation the payment of which is payable upon completion of the merger. Certain of Martin Marietta's executive officers, including Chief Executive Officer Nye, may receive compensation under Martin Marietta's executive compensation programs attributable to additional responsibilities in connection with the merger and subsequent integration process.
All this discloses is that Mr. Nye is one of the directors whose compensation might increase after the merger. The supplemental disclosure adds nothing further. Without this disclosure, this was an obvious assumption since Mr. Nye is the Company's President and CEO. One would imagine that those shareholders (if any) who actually bother to read until page 72 are likely to know who Mr. Nye is, and, likewise, are savvy enough to know that the CEO of the acquiring company will probably make more money after the merger.
2015 Decision at 21 (some citations omitted). The court has nothing further to add in this regard. This is not a useful disclosure.

V. Supposedly Comparable Post-Gordon Cases
In asking this court to approve their settlement, plaintiffs rely on two of this court's post-Gordon decisions in which final approval of a disclosure-only class action settlement was granted. See Roth v Phoenix Cos., 56 Misc 3d 191 (Sup Ct, NY County 2017); Saska v Metro. Museum of Art, 57 Misc 3d 218 (Sup Ct, NY County 2017). That reliance is misplaced. Neither case was a strike suit seeking the extraction of a merger tax. Both cases involved seemingly meritorious claims that were settled in exchange for highly beneficial disclosures that directly remedied the wrongs alleged by plaintiffs.
Roth "concerned the reduction of a company's reporting obligations by virtue of a going private transaction and the allegedly inadequate disclosure of the transaction's implications to the company's bondholders." Roth, 56 Misc 3d at 193. Specifically, the merger agreement would have eliminated the rights of the company's bondholders to receive certain financial disclosures. See id. at 193-94. Roth, thus, was about whether, after the merger, bondholders would lose their right to financial transparency. The parties' settlement preserved the bondholders' disclosure rights. See id. at 194. In approving the settlement, the court explained:
[T]he Settlement is outstanding. It provides for expeditious beneficial relief for the class that affords them material remedial disclosures without the need for protracted, costly litigation. While disclosure-only settlements resolving pre-merger lawsuits are the subject of much controversy and often properly viewed with a fair degree skepticism, this case lacks the pernicious indicia of a frivolous "strike suit" seeking a "merger tax". Here, the gravamen of plaintiff's complaint is a challenge to the disclosure implications of the merger, which the court finds to have been well-founded. The terms of the Settlement sufficiently remedy plaintiff's concerns.
Id. at 195 (emphasis added; internal citations omitted).
Here, plaintiffs call the court's attention to its remarks in the first half of footnote 4 in Roth, where the court stated that "Gordon's 'some benefit' test [] cannot be viewed as anything other than an outright rejection of Trulia's 'plainly material' standard." Id. at 195 n.4. But plaintiffs ignore the rest of that footnote, where the court stated that "[t]he disclosure suit here [i.e. in Roth] is worthy of being brought, the Settlement provides real benefit to the class, and the way in which counsel litigated and resolved the case is praiseworthy," and that "[t]he remedial disclosures would pass muster under Trulia (meaning that Gordon's lower standard is easily [*16]satisfied)." See id. 
That footnote was not gratuitous. At the time the court issued Roth, it was well aware of the First Department's decisions in Gordon and City Trading II and anticipated that Gordon would be applied in this case upon remand. Given the differences between this case and Roth, the court thought it was important to note why approval of the disclosure-only settlement in Roth was warranted without also implying that all disclosure-only settlements necessarily would pass muster under Gordon. The stark differences between this case and Roth render Roth a poor case for plaintiffs to invoke to bolster their application for approval.
Saska also is distinguishable. That case principally concerned whether the Metropolitan Museum of Art's "pay what you wish" admissions policy was deceptive such that it violated General Business Law § 349. See Saska v Metro. Museum of Art, 42 Misc 3d 548, 549 (Sup Ct, NY County 2013), aff'd sub nom. Grunewald v Metro. Museum of Art, 125 AD3d 438 (1st Dept 2015). Saska did not involve allegations of inadequate disclosures regarding a proposed merger. In granting approval of the parties' disclosure-only class action settlement, the court explained the potential merit in plaintiffs' claims and the significant benefits of the new disclosures. Specifically, the court found that the Museum's new signage would significantly improve the public's awareness that it could enter the Museum for as little as a penny, and that the Museum was merely seeking a voluntary, suggested admission fee. See Saska, 57 Misc 3d at 220-22. As in Roth, this court noted the differences relative to the sort of merger disclosures at issue in Gordon and Trulia:
To the extent [the objector contends] that the Settlement is supposedly the sort of worthless disclosure-only settlement of a merger tax suit addressed by this court in [City Trading Fund v Nye] and by the Delaware Court of Chancery in [Trulia], that argument is meritless. The First Department's decision in Gordon completely undercuts her argument. Regardless, this case is not a merger strike suit; it bears absolutely no resemblance to a lawsuit about inadequate pre-merger disclosure. Rather, this case concerns whether the Museum's patrons were deceived by the Museum's admission policy. The instant settlement, which remediates any possible deception, provides a real benefit to the public. [The objector's] suggestion that the benefits of the new signage are as illusory as a gratuitous "tell me more" corporate disclosure is specious. This is a real value-added settlement; it is not horse-hockey. And regardless of the outcome, the case is certainly not frivolous.
Id. at 224-25 (internal citations omitted); see also id. at 224 (noting that plaintiffs' counsel was "the antithesis of counsel who bring strike suits seeking to quickly profit on worthless disclosure-only settlements.").

Plaintiffs also made a post-argument submission of the attorneys' fee award issued in Gordon upon remand, presumably to bolster their approval application and to justify the quantum of fees sought. On November 29, 2017, plaintiffs submitted the October 26, 2017 transcript from the hearing in Gordon where Justice Ostrager (who inherited the case from Justices Schweitzer and Singh) awarded plaintiff's counsel $1.5 million in attorneys' fees. See Dkt. 190 at 14. That award is of no moment. Unlike the case here, the Appellate Division had already granted final approval of the settlement. That said, Justice Ostrager noted that he read "a very compelling affidavit from a very credentialed expert who opined that the benefit that was obtained was not material," and therefore reduced the requested fee award by $500,000. See id. Moreover, the dollar value of the merger was much greater in Gordon ($130 billion vs. $2.7 [*17]billion). Hence, even if the court approved the settlement in this case, the attorneys' fee award would be much smaller, and certainly far less than the $500,000 requested by plaintiffs. 
At most, the court would have considered an award similar in size to the mootness fees ($50,000) issued in cases where the disclosures could not pass muster under Trulia. See Xoom, 2016 WL 4146425, at *3 ("Plaintiffs generated four additional disclosures, which the Defendants concede resulted from the litigation. The question is whether those disclosures added value to the stockholders, and, if so, how much of Plaintiffs' costs should thus be borne by the Defendants, in equity."). Here, as discussed, the supplemental disclosures were not at all helpful to the shareholders. Xoom — a case regarded positively by the First Department — is instructive in this regard, as it highlights relatively worthless disclosures that still are of a greater value than those at issue in this case.
In Xoom, the Vice Chancellor held "that the Supplemental Disclosure regarding the conflict of the financial advisor, although providing some information as to magnitude lacking in the initial disclosure, was only mildly helpful to stockholders." Id. at *4. Likewise, he found "that the supplemental disclosure of additional financial metrics concerning [the company's] comparable-companies analysis are of minimal benefit to a stockholder considering this Merger." Id.[FN21]
His conclusion was that "[o]f the four disclosures that resulted from the litigation, those involving the banker conflict and post-Merger employment discussions are the most valuable." Id. Though he found "[n]one of the [supplemental disclosures] particularly strong", he held that "[c]umulatively, [they] represent a modest benefit to the stockholders." Id. 
In ultimately deciding to award plaintiff's counsel a $50,000 fee, the Vice Chancellor provided a useful analysis for the post-Trulia landscape:
In the merger context, under our model, this Court relies on the plaintiffs' bar, as representatives of stockholders, to vindicate those stockholders' rights to a fair transaction and an informed vote. Given the fast-moving process typical in the merger context, it is common that suit is filed at a preliminary phase of the proceedings. The decision of plaintiffs' counsel, proceeding on a contingent-fee basis, to pursue such litigation involves significant risk; any recovery to counsel is contingent on producing value for the stockholder class. Because no recovery is available absent value so produced, when counsel have in fact worked a benefit on the class, this Court must award a fee sufficient to encourage wholesome levels of litigation.
The position of the Plaintiffs' counsel is reminiscent of a rodeo bull-rider. The cowboy gets his bull by the luck of the draw. A "good" bull is aggressive and vigorous; a "bad" bull is the opposite. A successful ride of a good bull results in a high score. It takes a good rider to ride a good bull, but not even a great rider can wring a high score from a bad bull. Not even great counsel can wring significant stockholder value from litigation over an essentially loyal and careful sales process.
Where litigation develops significant stockholder value, this Court will set fees accordingly.
Id. at *5 (emphasis added). 
Here, the court does not believe a reasonable jurist could conclude that the supplemental [*18]disclosures in this case were more useful than those in Xoom. Hence, even if the court found that Gordon mandated approval (and it does not), the court would not award fees in excess of $50,000 since that apparently is the market price for minimally beneficial disclosures than nonetheless are of "some benefit."[FN22]
The court, however, will not award anything to plaintiffs' counsel because the disclosures here are worthless. In the parlance of Vice Chancellor Glasscock, the bull in this case is Ferdinand.[FN23]

VI. The Gordon Approval Factors
While it is clear to the court that the supplemental disclosures are utterly worthless — because they would not matter to any reasonable shareholder and provide no benefit to the class — the court will not eschew its obligation to formally evaluate each of the Gordon approval factors. "These factors are: (1) the likelihood of success on the merits; (2) the extent of support from the parties; (3) the judgment of counsel; (4) the presence of bargaining in good faith; (5) the nature of the issues of law and fact; (6) whether the agreed upon disclosures (or other non-monetary relief) are in the best interests of all of the members of the class; and (7) whether the settlement is in the best interest of the corporation." Dkt. 130 at 17, citing Gordon, 148 AD3d at 157-58.
The first and fifth factors militate against approval because plaintiffs have not established a likelihood of success on the merits. As discussed, it is well settled that to state a claim for breach of fiduciary duty for omitting material facts to shareholders considering a merger, the plaintiff must plead the omission of a material fact. In re Solera, 2017 WL 57839, at *9.[FN24]
An [*19]omission is only material if there is a "substantial likelihood" that the information would be considered important to a reasonable shareholder when deciding how to vote. Id.; see In re Ebix, Inc. Stockholder Lit., 2016 WL 208402, at *21 (Del Ch 2016) ("The Court's determination of a given misstatement or omission's materiality is decided from the standpoint of a reasonable stockholder.") (emphasis added). As discussed, this is not only true under Delaware law (which governs since North Carolina law, which follows Delaware law, applies under the internal affairs doctrine), but under New York law as well. See Rachmani, 71 NY2d at 726. A plaintiff who does not plead a material misstatement or omission will have its disclosure claims dismissed on a pre-answer motion. See Nguyen v Barrett, 2016 WL 5404095, at *1 (Del Ch 2016). Ergo, that plaintiff will not prevail on the merits. 
Here, there is zero doubt in this court's mind that it would have granted a motion dismiss because plaintiffs did not allege any material misstatements or omissions.[FN25]
As discussed in the 2015 Decision, the court was prepared to deny the preliminary injunction motion for this very reason. See id. at 3. Nothing in Gordon purports to change the substantive law of materiality. Gordon, however, reiterates the importance of assessing the likelihood that plaintiffs would have prevailed on the merits. Plaintiffs indisputably would have lost this case. 
Turning to the second factor, the extent of support from the parties, the only shareholder who supports the settlement is plaintiff CTF. By contrast, shareholders that own shares worth hundreds of thousands of dollars more than CTF's nominal holding of ten shares have objected. Contrary to plaintiffs' protestations, the court does not view their objections cynically on the ground that they would rather not have the Company pay any legal fees to plaintiffs' counsel. The court recognizes that institutional shareholder objectors are repeat players. They own shares in many publicly traded companies, and their incentive is to ensure their fellow shareholders do not sue the companies in which they own stock unless such suits ultimately benefit all of the shareholders (as opposed to one shareholder's counsel). Merger litigation in which no actual material omissions are alleged and which results in worthless disclosure-only settlements harm shareholder value. And even if there is "some benefit" to the settlement (which is not the case here), if the value of that benefit is exceeded by the legal costs to the company, the shareholders are net losers. See Trulia, 129 A3d at 897. The only winners are the lawyers. This is not a controversial view. It is the view of the Delaware Court of Chancery, two Federal Circuit Courts of Appeal, and respected legal academics. 
Likewise, when assessing the "support from the parties" factor, objections from institutional shareholders (including pension funds, which manage "main street's" money) should be given significant weight. Likewise, a compelling case should be made before disregarding the opinions of the most respected business courts and legal commentators. In that regard, it is notable that the meaning of Gordon's "some benefit" test was left undefined (though, as noted, Gordon may have been invoking the standard set forth in XOOM), and thus there is no reason why that test cannot be interpreted to have some teeth. There is surely a middle ground between rubber stamping settlements and requiring a Trulia-like heightened showing. Our courts should be permitted to fulfill their role as the gatekeeper of class action settlements to ensure that [*20]shareholder value is not being destroyed settling baseless litigation for illusory consideration.[FN26]

As for the third factor — the judgment of counsel — it does not weigh in favor of settlement. There is much that is wrong with the approach of plaintiffs' counsel. While some courts have countenanced the tactics of the Brualdi Firm, others, such as the Delaware Court of Chancery, have taken issue with its frivolous tactics. See 2015 Decision at 15. The frivolous nature of this case cannot be overlooked. To be sure, there is nothing wrong with the judgment of defendants' counsel. The court cannot fault them for rationally seeking to settle this case in their clients' best interest. Their perverse incentive is one of the very ills that Trulia sought to correct. Yet, the incentives that resulted in settlement limit the importance of this factor.
Finally, the court must assess whether the settlement is in the best interests of the members of the class and the corporation. In other words, are the Company and its shareholders better off if the court permits plaintiffs' disclosure claims to be settled in consideration for the supplemental disclosures and a substantial attorneys' fees award? The answer is no.
There is no question that plaintiffs' motion to enjoin the merger was going to be denied and, were there a motion to dismiss, that motion would have been granted. None of the alleged misstatements and omissions in the definitive proxy are material. As discussed in the 2015 Decision and expanded upon in Trulia, the only reason the Company sought to settle plaintiffs' baseless claims was because it was rational for it to do so. The question of whether the Company was rational in deciding to settle should not be conflated with the question of whether the settlement is in the best interest of the Company and its shareholders. Such a conflation could lead to the unfortunate conclusion that all settlements of frivolous disclosure lawsuits should be approved by the court. That is neither the law nor sensible public policy. The court's role in this non-adversarial context is to look out for the best interest of the class, especially when its incentives are corrupted by lawyers who seek to leverage the uncertainly of merger litigation into a quick and easy payment. Countering this tactic undermines the integrity of our court system because it rewards the use of litigation for rent seeking purposes — i.e., the extraction of money from shareholders while providing them no real value. Here, neither the Company nor its shareholders were made better off by the supplemental disclosures. None of [*21]them would have helped a reasonable shareholder better assess the wisdom of the merger. Ergo, they have no benefit. 
The supplemental disclosures, at best, are of the "tell me more" sort that countless courts have recognized are of little to no value, and which certainly do not substantially alter the total mix of available information. In other words, after having received the supplemental disclosures, the universe of information upon which shareholders decided whether to vote in favor of the merger did not meaningfully change. As discussed, the institutional investors who weighed in here explained that reasonable shareholders would have been indifferent to the supplemental disclosures. To be sure, under controlling (i.e., Gordon) and persuasive (i.e., Delaware) authority, a stockholder's counsel deserves at least some reward if he can procure information that, while not landscape changing (i.e., material), is of some benefit to the stockholders. Plaintiffs' counsel has not done so in this case. The shareholders are not better off. In fact, the shareholders are net losers here, for at least two reasons. The first, obvious reason, is the payment of counsel fees in exchange for worthless supplemental disclosures. The second, less obvious reason is that there is a cost to the shareholders if, in fact, management concealed material facts about the merger. Even though the settlement only calls for a release of disclosure violations (i.e., it is not a galactic release), there is no reason the shareholders should lose the right to eventually file a post-closing action alleging inadequate disclosures if, in fact, some subsequent revelation makes clear that, unlike those at issue in this case, there were material facts withheld from them. To be clear, the court has no reason to believe that is the case here. However, shareholders do not benefit from giving up the right to pursue future meritorious claims in exchange for relief from patently baseless ones. In other words, settling a baseless claim should not create immunity for a related, but currently unknown meritorious claim.
In sum, the court cannot find any benefit in the settlement for the Company or its shareholders. The Company and its shareholders are net losers here. Consequently, the court will not grant final approval of the settlement. Accordingly, it is
ORDERED that plaintiffs' motion for final approval of the settlement is denied; and it is further
ORDERED that within three weeks of the entry of this order on the NYSCEF system, the parties shall jointly call the court to address how they wish to proceed.
Dated: February 8, 2018
Shirley Werner Kornreich
J.S.C.



Footnotes

Footnote 1:Plaintiff City Trading Fund (CTF) owns 10 shares. It is a general partnership; plaintiffs Lawrence Bass and Andres Carullo are its partners.

Footnote 2:Solomon v Pathe Commc'ns Corp., 1995 WL 250374, at *4 (Del Ch 1995) (Allen, C.) ("It is a fact evident to all of those who are familiar with shareholder litigation that surviving a motion to dismiss means, as a practical matter, that economical rational defendants (who are usually not apt to be repeat players in these kinds of cases) will settle such claims, often for a peppercorn and a fee."), aff'd, 672 A2d 35 (Del 1996); see Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform, 93 Tex LRev 557 (2015).
Footnote 3:References to "Dkt." followed by a number refer to documents filed in this action in the New York State Courts Electronic Filing system (NYSCEF). All capitalized terms not defined herein have the same meaning as in the 2015 Decision.

Footnote 4:Gordon has been harshly criticized by a respected corporate law academic. See John C. Coffee, Jr., The Race to the Bottom: Is the Last Stop New York?, The CLS Blue Sky Blog (Mar. 20, 2017), available at http://clsbluesky.law.columbia.edu/2017/03/20/the-race-to-the-bottom-is-the-last-stop-new-york/ ("Important decisions in Delaware and federal court had made very clear that fees would not be awarded for meritless litigation that resulted in only a few immaterial disclosures being made. Several New York decisions had also agreed [i.e., this court in the 2015 Decision, Justice Schweitzer in Gordon, and Justice Ramos in Matter of Allied Healthcare Shareholder Lit., 49 Misc 3d 1210(A) (Sup Ct, NY County 2015)]. The best law firms in the plaintiff's bar did not bring such actions (or had at least ceased to bring them. In 2016, the rate of mergers challenged in court actually fell below 90 percent. Maybe, it seemed, reform was working. That optimism was, however, crushed last month when the [First Department] broadly disagreed with Delaware and the federal courts and reversed a state Supreme Court judge who had sensibly rejected an egregious settlement involving only immaterial disclosures and a token corporate governance reform."). Professor Coffee persuasively explained that attempting to attract strike suits in New York would actually have the perverse effect of deterring truly meritorious cases concerning corporate malfeasance (of which he cites a number of recent examples), and opines that a "realistic (and possibly cynical) explanation of [Gordon is] that it was designed to preserve New York as a world of cheap, collusive settlements with little risk of major liability." He also noted that "[t]he unpleasant truth is that, although Delaware and some federal courts have tried justifiably to restrict 'disclosure only' settlements, it takes only one state to lead a race to the bottom," and concluded with the following lament:
[Gordon] will ensure that the nuisance suit remains alive and well in New York and should bring the worst of the plaintiff's bar streaming back to New York. Unless the Court of Appeals reverses, New York will become celebrated as the jurisdiction of the judicial rubber stamp. Sadly, New York state courts once prided themselves on following in the footsteps of Cardozo and Fuld. Today, however, they appear to be carrying on a tradition established by another famous New Yorker: Boss Tweed!

Id. As discussed herein, while the federal courts have embraced Trulia and deterred such a "race to the bottom", New York has not.
Footnote 5:See 2015 Decision at 14 (the "modus operandi of [plaintiffs] and the Brualdi Law Firm" is to "purchase nominal amounts of shares in publicly traded companies" and "[t]hen, when one of the companies announces a merger, [plaintiffs engage] the Brualdi Law Firm to file a merger tax lawsuit", and that "[s]ince 2010, the Brualdi Law Firm has filed at least 13 lawsuits in this court in the name of different partnerships."), 15 (similar prior strategy in Delaware resulted in sanctions), 25-29 (plaintiffs waited until definitive proxy was filed to seek injunction to maximize settlement pressure, and then proffered deceptive legal justification for doing so).

Footnote 6:For reasons that are unclear, the briefing on this motion was filed under motion sequence number 004, the motion in which plaintiffs, on May 30, 2017, sought approval of the form and method of notice to the class of the settlement hearing (which the court granted by order dated June 21, 2017). As no one has objected, the court will overlook this procedural irregularity and treat the motion as if it had been made with a formal notice of motion under a new motion sequence number. It is undisputed that notice was properly given to all interested parties and the class.

Footnote 7:Delaware's materiality standard was actually modeled on the federal standard. In re Solera, 2017 WL 57839, at *9.

Footnote 8:In Trulia, the Chancellor eloquently explained the dynamic of strike suits as follows:
[P]laintiffs leverage is the threat of an injunction to prevent a transaction from closing. Faced with that threat, defendants are incentivized to settle quickly in order to mitigate the considerable expense of litigation and the distraction it entails, to achieve closing certainty, and to obtain broad releases as a form of "deal insurance." These incentives are so potent that many defendants self-expedite the litigation by volunteering to produce "core documents" to plaintiffs' counsel, obviating the need for plaintiffs to seek the Court's permission to expedite the proceedings in aid of a preliminary injunction application and thereby avoiding the only gating mechanism (albeit one friendly to plaintiffs) the Court has to screen out frivolous cases and to ensure that its limited resources are used wisely.


Once the litigation is on an expedited track and the prospect of an injunction hearing looms, the most common currency used to procure a settlement is the issuance of supplemental disclosures to the target's stockholders before they are asked to vote on the proposed transaction. The theory behind making these disclosures is that, by having the additional information, stockholders will be better informed when exercising their franchise rights. Given the Court's historical practice of approving disclosure settlements when the additional information is not material, and indeed may be of only minor value to the stockholders, providing supplemental disclosures is a particularly easy "give" for defendants to make in exchange for a release.


Once an agreement-in-principle is struck to settle for supplemental disclosures, the litigation takes on an entirely different, non-adversarial character. Both sides of the caption then share the same interest in obtaining the Court's approval of the settlement. The next step, after notice has been provided to the stockholders, is a hearing in which the Court must evaluate the fairness of the proposed settlement. Significantly, in advance of such hearings, the Court receives briefs and affidavits from plaintiffs extolling the value of the supplemental disclosures and advocating for approval of the proposed settlement, but rarely receives any submissions expressing an opposing viewpoint.


Scholars have criticized disclosure settlements, arguing that non-material supplemental disclosures provide no benefit to stockholders and amount to little more than deal "rents" or "taxes," while the liability releases that accompany settlements threaten the loss of potentially valuable claims related to the transaction in question or other matters falling within the literal scope of overly broad releases. One recent study provides empirical data suggesting that supplemental disclosures make no difference in stockholder voting, and thus provide no benefit that could serve as consideration for a settlement


Trulia, 129 A3d at 892-93, 895 (emphasis added). Given this dynamic, as discussed in the 2015 Decision, it is rational for a company to settle a frivolous disclosure lawsuit. See id. at 22. Prior to Gordon, the First Department refused to countenance similar cases involving spurious disclosure claims. See Tanzer v Turbodyne Corp., 68 AD2d 614, 618-19 (1st Dept 1979). 

Footnote 9:See In re Riverbed Tech., Inc. Stockholders Lit., 2015 WL 5458041, at *6 n.21-22 (Del Ch 2015).
Footnote 10:Trulia, 129 A3d at 895 ("Scholars have criticized disclosure settlements, arguing that non-material supplemental disclosures provide no benefit to stockholders and amount to little more than deal 'rents' or 'taxes,' while the liability releases that accompany settlements threaten the loss of potentially valuable claims related to the transaction in question or other matters falling within the literal scope of overly broad releases."); see id. n.29 (collecting citations to academic articles).

Footnote 11:Though Farber was decided after Gordon, Walgreen was decided beforehand. It is unclear if the First Department was aware of Walgreen at the time it issued Gordon. Historically, our state courts have modeled New York's class action rules, such as rules for preliminary and final approval, on the federal standards. See City of New York v Maul, 14 NY3d 499, 510 (2010). The rationale for doing so is the federal courts' extensive experience with complex class actions; it makes sense to heed the rules they craft based on their wealth of experience. In like manner, the Delaware courts are uniquely suited to understand which types of merger challenges have merit, and, specifically, what types of disclosures matter to shareholders. Indeed, the Appellate Division has recognized that where there is a dearth of precedent on an issue of New York corporate law, our courts should look to the Delaware Court of Chancery for guidance. See Ficus Investments, Inc. v Private Capital Mgmt., LLC, 61 AD3d 1, 9 (1st Dept 2009) (noting that Delaware courts' holdings "can be instructive."). It is no secret that the Commercial Division strives to develop a reputation on par with the Chancery Court. To do so, out corporate law must be considered as savvy as Delaware's. Developing a reputation for attracting and countenancing worthless strike suits (i.e., Professor's Coffee's fear) accomplishes the opposite result.
Footnote 12:Plaintiffs agree that Gordon is the controlling authority. See Dkt. 130 at 7.

Footnote 13:It should be noted that in Gordon, the First Department held that the settlement's "corporate governance reform" constituted a benefit to the shareholders. See id. at 160; see also id. at 149 ("The proposed settlement agreement included certain additional disclosures of the terms of the transaction as well as a corporate governance reform proposal, but lacked any monetary compensation to the shareholders.") (emphasis added). Here, the settlement does not provide for any such reforms. By contrast, the only supposed benefits in this case are the supplemental disclosures. The settlement in Gordon can be distinguished from the settlement in this case on this ground alone.

Footnote 14:See also Dell, Inc. v Magnetar Glob. Event Driven Master Fund Ltd., 2017 WL 6375829, at *26 n.185 (Del. Dec. 14, 2017), citing In re of SWS Grp., Inc., 2017 WL 2334852, at *11 (Del Ch 2017) ("The DCF valuation, although complex in practice, is rooted around a simple principle: the value of the company at the time of the merger is simply the sum of its future cash flows discounted back to present value. The calculation, however, is only as reliable as the inputs relied upon and the assumptions underlying those inputs.").

Footnote 15:The same omissions appear in plaintiffs' reply brief. See Dkt. 172 at 6. The court also does not understand why plaintiffs cite myriad pre-Trulia Delaware cases as examples of supplemental disclosures that warrant approval. As Trulia explains, the Delaware courts (like the New York courts) used to be quite lax in their review and approval of disclosure-only settlements. Nonetheless, as discussed, the subject supplemental disclosures are far less valuable than those the Delaware courts have found sufficiently beneficial to warrant approval.

Footnote 16:This inapposite reliance on supposedly supporting authority is not an isolated incident (which, perhaps, could be overlooked). It has been pervasive in plaintiffs' briefs throughout this case. See, e.g., 2015 Decision at 28 (noting plaintiffs' selective citation to favorable authority and omission of unfavorable on-point authority).

Footnote 17:Familiarity with this discussion is assumed, and it is not repeated here.

Footnote 18:The supplemental financial disclosures in Gordon were different. There, the company disclosed "further detail as to the financial advisor's use of operating and financial metrics in its comparable transactions analysis." See Gordon, 148 AD3d at 159.
Footnote 19:As defendants previously explained:
Plaintiff also argues that the Proxy is deficient because it "fail[s] to disclose the TXI Street Case and the Martin Marietta Street Case financial estimates[] relied upon by the Martin Marietta Financial Advisors in the Fairness Opinions". This argument fails as well. As disclosed in the Proxy, the TXI and Martin Marietta Street Cases are third-party estimates of EBITDA drawn from the Institutional Brokers' Estimate System, which is publicly available. No further disclosure by TXI or Martin Marietta is required. [See, e.g., In re Gen. Motors (Hughes) S'holder Litig., 2005 WL 1089021, at *17 (Del. Ch. May 4, 2005) (rejecting disclosure claim regarding valuation of company on several grounds, including that one of the disclosed means of valuation was based on the company's stock price which was "publicly available" and would not "have altered the total mix of information already available"); In re Micromet, Inc. S'holders Litig., 2012 WL 681785, at *12 (Del. Ch. Feb. 29, 2012)].


The cases cited by Plaintiff are distinguishable. In Maric Capital and Netsmart, the board had failed to disclose the non-public projections that had been given to the financial advisors by management. Maric Capital Master Fund, Ltd. v. Plato Learning, Inc., 11 A.3d 1175, 1178 (Del. Ch. 2010); In re Netsmart Technologies, Inc. S'holders Litig., 924 A.2d 171, 202-03 (Del. Ch. 2007). Here, management projections provided by Martin Marietta to its financial advisor were disclosed.

Dkt. 31 at 16 (emphasis added; some internal citations omitted).
Footnote 20:The shares of all publicly traded corporations are owned by countless institutional investors, such as pension funds. All institutional investors pay for banking services. All mergers include the advice of banks. It would be unreasonable to require all institutional investors in a merging company to disclose their banking relationships in the proxy. This would be an intrusive requirement, especially given the irrelevance of this information. The court is unaware of any court that has suggested this should be done or that there is shareholder demand for this information. As defendants explained:
 
 [T]he Proxy already discloses the fees earned by J.P. Morgan from TXI itself, and Plaintiff does not challenge anything about this disclosure. Plaintiff complains instead that the Proxy fails to disclose the amount of fees J.P. Morgan earned from a TXI shareholder. Other courts have expressly held that such information is not material, e.g., Ex. 22, Transcript of Oral Argument ("Tr.") at 34-35, 
 Equity Trading v. Ginsburg, No. 14-cv-00499-RWS, Dkt. No. 24 (S.D.NY Jan. 30, 2014), and we are aware of no case requiring disclosure of the amount of such compensation. In any event, the Proxy here states that "J.P. Morgan's commercial banking affiliate has provided treasury and securities services to NNS Holding, a significant stockholder of TXI, for which it has received 
 customary compensation". When a proxy discloses that an advisor's fees are "'customary' . . . but [does] not provide further details," there is no basis to conclude, "[w]ithout a well-pled allegation of exorbitant or otherwise improper fees", that further disclosure about the fee "would significantly alter the total mix of information available to stockholders". [Globis, 2007 WL 4292024, at *13]; 
 see also Tr. at 6, In re Mako Surgical Corp. Stockholder Litig., Civ. A. No. 8958-VCG (Del. Ch. Nov. 5, 2013) (noting that "[t]he description 'customary' is not misleading if true"). Plaintiff has not alleged that the fees earned by J.P. Morgan were not in fact customary.
Dkt. 31 at 14-15 (some internal citations omitted).
Footnote 21:As noted earlier, a comparable-companies analysis was provided in Gordon. Gordon, unlike Xoom, saw value in such information (the utility of which, in truth, will vary depending on whether, for instance, there are sufficiently comparable companies in the industry).

Footnote 22:Where the Chancery Court has award higher mootness fees, there was a benefit beyond a mere useful disclosure. See Black, 2016 WL 790898, at *6 ("The benefits achieved here are not strictly limited to additional disclosures. In addition to disclosures, LAMPERS is entitled to credit for achieving a relaxation of a deal protection measure.") Indeed, in Black, "supplemental disclosures were achieved but were of no more than nominal value." Id. at *7. Yet, even there, where counsel provided a bona fide benefit by making a substantive contribution to the deal, the mootness fee was less than $150,000. See id. at *8. Thus, the $500,000 sought by plaintiffs' counsel is out of line with the current market price for a settlement of minimally beneficial disclosures without any enhancement to the deal process or corporate governance reform.
Footnote 23:See Munro Leaf, The Story of Ferdinand (Viking Press 1936).

Footnote 24:"To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials. [O]mitted information is material if a reasonable stockholder would consider it important in deciding whether to tender his shares or would find that the information has altered the 'total mix' of information available." Pfeffer v Redstone, 965 A2d 676, 686 (Del 2009) (citations and quotation marks omitted); see In re Crimson Exploration Inc. Stockholder Lit., 2014 WL 5449419, at *26 n.184 (Del Ch 2014), citing Wayne Cty. Empls. Ret. Sys. v Corti, 2009 WL 2219260, at *8 (Del Ch 2009) (to establish material omission from proxy statement, "a plaintiff 'must show a substantial likelihood that the omitted facts would have assumed actual significance in the deliberations of a reasonable stockholder because, if disclosed, those facts would have significantly altered the total mix of information available to stockholders.'") (citation omitted); In re BioClinica, Inc.Shareholder Lit., 2013 WL 5631233, at *9 (Del Ch 2013) ("I have no reason to believe that a reasonable stockholder would perceive the basis for adopting management's revised estimate of capital expenditures as adding to the total mix of information. Therefore, this claim fails to identify a material omission.").

Footnote 25:The reasons why the ten alleged omissions are immaterial are discussed at length in the 2015 Decision and will not be repeated here.

Footnote 26:Since companies are only legally required to disclose all material facts in connection with a merger, every single proxy will surely omit at least some immaterial fact that might be of some benefit to the shareholders. It is easy to see why permitting a significant attorneys' fee award for the procurement of an immaterial disclosure, but which is of some benefit, incentivizes a lawsuit in connection with every single merger. This court does not understand what public policy is served by creating this incentive (which Trulia meant to eliminate). Nor does this court understand why the procurement of immaterial supplemental disclosures are a feat worth rewarding. Surely, with minimal effort, the board can find some immaterial, supposedly "useful" fact to provide to plaintiff's counsel that will allow the company to dispose of the lawsuit for less than it would cost to file a motion to dismiss. A lawyer who files the case with the intention of settling, not for the procurement of a supplemental material disclosure, but for the mere disclosure of minimally beneficial facts, is not seeking to protect or vindicate the legal rights of the shareholders he purports to represent (i.e., since shareholders only have the right to material information). The very point of the lawsuit was simply to get paid — by the shareholders — to go away. This is a pernicious motive for lawsuit.